UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

_____

| | |
|---|---|
| LIDIA LECH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DOROTHEA VON GOELER, MD; | ) |
| BAYSTATE MEDICAL PRACTICES, INC.; | )   C.A. No. 3:2017-cv-30024 |
| HAMPDEN COUNTY SHERIFF'S DEPARTMENT; | ) |
| MARIA DIAZ; | ) |
| NICOLE SKORUPSKI; | ) |
| ELIZABETH MEAUX; | ) |
| SHANTELLE ROSADO; | ) |
| JULIE BELLE-ISLE; | ) |
| LYNN CHASE; | ) |
| MICHAEL J. ASHE, JR.; | ) |
| NICHOLAS COCCHI; | ) |
| PATRICIA MURPHY; | ) |
| NATALIE CRUZ; | ) |
| MICHAEL VANCINI; | ) |
| Defendants. | ) |

_____)

## SECOND AMENDED COMPLAINT AND JURY DEMAND FOR WHICH LEAVE TO FILE WAS GRANTED ON JANUARY 27, 2020

The Plaintiff, Ms. Lidia Lech, by and through her attorneys, David Rountree, Esq., and

John Godleski, Esq., for her Complaint against the Defendants, alleges, on knowledge as to their

own actions, and otherwise upon information and belief, as follows:

## INTRODUCTION

The Plaintiff, Ms. Lech, seeks relief for mistreatment she endured as a pregnant inmate

incarcerated at the Western Massachusetts Women's Correctional Center ("WCC") located in

Chicopee, MA and operated by the Hampden County Sheriff's Department. This mistreatment culminated in the stillbirth of her baby.

By this lawsuit, Ms. Lech seeks to remedy violations of her rights under the Eighth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §1983; Article 26 the Constitution of the Commonwealth of Massachusetts; the Massachusetts Civil Rights Act, G.L. c. 12, 11I, and Massachusetts tort law. Therefore, the Plaintiff files this civil action seeking monetary damages, equitable relief, and declaratory judgment for injuries suffered from medical malpractice, deprivation of civil rights and violations of statutory and common law.

## THE PARTIES

1. Plaintiff, Lidia Lech ("Ms. Lech"), is an individual who lives in Southampton, MA within Hampshire County.

2. Defendant, Dorothea Von Goeler, MD is a licensed physician and specialist in internal and preventative medicine. At the times relevant to this complaint, it is believed that she was a contract employee with the Hampden County Sheriff's Department provided direct primary care services to Ms. Lech. Defendant, Dorothea Von Goeler keeps a business address of Baystate Brightwood Health Center, 380 Plainfield Street, Springfield, MA 01107.

3. Defendant, Baystate Medical Practices, Inc., is a duly organized Massachusetts corporation with a principle office at 759 Chestnut Street, Springfield, MA 01199. At all times material to this complaint Baystate Medical Practices, Inc. was legally responsible for the actions of Defendant Von Goeler under the doctrine of Respondent Superior as applied to the medical profession in *Dias v. Brigham Med. Assoc.*, 483 Mass. 317 (2002).

2

4.  Defendant Hampden County Sheriff's Department is an executive department of the Commonwealth of Massachusetts and is a "public employer" under G.L. c.258, § 1.

5.  Defendant, Maria Diaz, was employed as a Registered Nurse by the Hampden County Sheriff's Department at all times material to this complaint. At the time that the original complaint was filed, Defendant Diaz was a Nurse Practitioner who was believed to be in private practice with a principle place of business at 819 Worcester Street, Suite #3, Springfield, Massachusetts 01151-1045. Presently, it is believed that Defendant Diaz is employed as a nurse working at dialysis and acute care centers in Western Massachusetts.

6.  Defendant, Nicole Skorupski, is a Nurse Practitioner and employee of the Hamden County Sheriff's Department. At all times material to this complaint, her responsibilities included providing adequate and timely medical care to prisoners at the WCC. Defendant Skorupski's regular place of business is the Western Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013.

7.  Defendant, Elizabeth Meaux, is a Registered Nurse and a Nursing Supervisor and an employee of the Hampden County Sheriff's Department. At all times material to this complaint, her responsibilities included providing adequate and timely medical care to prisoners at the WCC.  Defendant Elizabeth Meaux's regular place of business is the Western Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013.

8.  Defendant, Shantelle Rosado was, at all times material to this complaint, a nurse and an employee of the Hampden County Sheriff's Department. At all times material to

this complaint, her responsibilities included providing adequate and timely medical

care to prisoners at the WCC.  At the time that the original complaint was filed, it was

believed that Defendant Rosado's regular place of business is the Western

Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee,

MA 01013. Presently, it is believed that Defendant Rosado is employed as a nurse for

the Commonwealth Care Alliance in Springfield, MA.

9.  Defendant, Julie Belle-Isle, is a nurse and an employee of the Hampden County

Sheriff's Department. At all times material to this complaint, her responsibilities

included providing adequate and timely medical care to prisoners at the WCC.

Defendant Belle-Isle's regular place of business is the Western Massachusetts

Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013.

10. Defendant, Lynn Chase, is a Registered Nurse and a Nursing Supervisor and an

employee of the Hampden County Sheriff's Department. At all times material to this

complaint, her responsibilities included providing adequate and timely medical care

to prisoners at the WCC and ensuring her subordinates provide adequate and timely

medical care to prisoners at the WCC.  Defendant Chase's regular place of business is

the Western Massachusetts Regional Women's Correctional Center, 701 Center

Street, Chicopee, MA 01013.

11. Defendant, Michael J. Ashe, Jr., was at all times relevant to this action the Sheriff of

Hampden County. Under G.L. c.126, § 16, he had custody and control of the jails and

houses of correction of Hampden County and of all prisoners committed thereto, and

was responsible for them and his subordinates. His responsibilities included the

establishment and enforcement of standards relating to the care, custody and safety of

all persons confined in the correctional facilities within Hampden County, Massachusetts. He was responsible for the administration of such facilities in accordance with federal and state law. Defendant Ashe maintained an office at the Hampden County Sheriff's Department Main Facility and House of Correction, 627 Randall Road, Ludlow, MA 01056.

11.5 Defendant, Nicholas Cocchi, is acting Sheriff of Hampden County. Under G.L. c.126, § 16, he has custody and control of the jails and houses of correction of Hampden County and of all prisoners committed thereto, and is responsible for them and his subordinates. His responsibilities include the establishment and enforcement of standards relating to the care, custody and safety of all persons confined in the correctional facilities within Hampden County, Massachusetts. He is responsible for the administration of such facilities in accordance with federal and state law. Defendant Cocchi maintains an office at the Hampden County Sheriff's Department Main Facility and House of Correction, 627 Randall Road, Ludlow, MA 01056. Defendant Cocchi is sued in his official capacity for the purposes of prospective injunctive relief.

12. Defendant, Patricia Murphy, is the Assistant Superintendant of the Western Massachusetts Women's Correctional Center in Chicopee Massachusetts and an employee of the Hampden County Sheriff's Department. It is believed that she acted in this capacity at all times relevant to this action. As Assistant Superintendant, she was directly responsible for the management and operation of the Western Massachusetts Women's Correctional Center, and responsible for the care, custody, safety, and treatment of all persons confined there; for the enforcement of rules and

5

regulations promulgated by the Hamden County Sheriff; and is responsible for the administration of the WCC in accordance with federal and state law. Defendant Murphy's regular place of business is the Western Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013.

13. Defendant, Correctional Officer Natalie Cruz, formerly named as defendant John Doe #1, is an employee of the Hampden County Sheriff's Department. Correctional Officer Natalie Cruz's regular place of business is the Western Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013. It is believed that Defendant Cruz is a Sergeant with the Hampden County Sheriff's Department.

14. Defendant, Correctional Officer Michael Vancini, formerly named as John Doe #2, is an employee of the Hampden County Sheriff's Department. Correctional Officer Michael Vancini's regular place of business is the Western Massachusetts Regional Women's Correctional Center, 701 Center Street, Chicopee, MA 01013. It is believed that Defendant Vancini is a Sergeant with the Hampden County Sheriff's Department.

15. Unless otherwise noted, each Defendant is sued in his or her individual and official capacities.

JURISDICTION AND VENUE

16. Jurisdiction is properly conferred by G.L. c. 212, § 4 and G.L. c. 223A, §§ 2 and 3.

17. Venue is proper under G.L. c. 223, §1, as the Plaintiff lives in Hampshire County.

STATEMENT OF FACTS

18. On or about October 2, 2013, after a violation of probation was found in the Holyoke District Court, Ms. Lech was sentenced to a period of incarceration to be served at the

6

Western Massachusetts Women's Correctional Center ("WCC") at 701 Center Street in Chicopee, MA.

19. At all times regarding this incident, Ms. Lech was in the custody of the Hampden County Sheriff's Department, was incarcerated at the WCC, and relied on Hampden County Sheriff's Department employees and/or contractors to take care of her medical needs.

20. The WCC, which is located at 701 Center Street in Chicopee, MA is approximately one mile from the Baystate Medical Center in Springfield, MA.

21. On October 4, 2013, a medical intake occurred conducted by Hampden County Sheriff's Department employees. During this intake, Ms. Lech told medical staff that she was pregnant. On this date, Ms. Lech was diagnosed as having a high risk pregnant by WCC medical staff.

22. On October 5, 2013, Ms. Lech came to seek medical aid and reported that she felt decreased fetal movement in her stomach. Ms. Lech also reported that she was experiencing some cramping as well. On this date, Ms. Lech was told by medical staff to drink water and lie on her side while monitoring fetal movement. Ms. Lech was told to advise medical staff if no fetal movement was felt for a period of one hour or more.

23. On October 8, 2013, Ms. Lech again self-reported to medical staff that she was a high-risk pregnancy. She explained to WCC medical staff that, approximately six years ago, Ms. Lech had experienced a miscarriage at five months due to a uterine rupture.

24. As early as October 22, 2013, WCC medical records indicate that Ms. Lech presented as a high-risk pregnancy and that the WCC was aware of this circumstance.

25. On October 16, 2013, Ms. Lech spoke with WCC medical staff. Ms. Lech complained of symptoms including persistent cramping on her right side.

26. On October 25, 2013, Ms. Lech spoke with WCC medical staff. Ms. Lech complained of symptoms including numbness in her extremities and reduced or absent fetal movement.

27. On October 29, 2013, Ms. Lech again spoke with WCC medical staff. Ms. Lech again complained of symptoms including numbness in her extremities and reduced or absent fetal movement.

28. On November 11, 2013, Ms. Lech spoke with Defendant Rosado at the WCC. On this date, Ms. Lech again explained that she was experiencing decreased fetal movement, that the fetal movement that she did feel was weaker, that she felt pain in the form of menstrual cramps, and that she was extremely worried because she had lost her last baby. Ms. Lech's concerns were forwarded to a certified nurse midwife at the WCC who advised Ms. Lech to report cramping when it occurred ten or more times per day. Ms. Lech was again instructed by WCC medical staff to rest with a cool cloth and to drink one glass of water per hour.

29. In the month of November 2013, Ms. Lech began keeping a "kick calendar." At times when the baby was active, Ms. Lech would lay down on her side and keep track of the amount of kicks she felt and record it accordingly on the "kick calendar."

30. On December 5, 2013, Ms. Lech was transported by WCC staff to the Baystate Medical Center in Springfield, MA where she was examined. The examination

showed that the baby was active. However, because of signs of anemia and an

assessed risk of uterine rupture, it was determined that a planned delivery was

necessary. On this date, and because Ms. Lech's pregnancy was considered high risk

by doctors, a cesarean section procedure was scheduled for January 15, 2014.

31. On December 9, 2013, Ms. Lech met with Defendant Von Goeler at the WCC. Ms.

Lech told Defendant Von Goeler that she was experiencing a rash, frequent urination,

and an itching sensation around her vaginal area. Ms. Lech also told Defendant Von

Goeler that she was expieriencing extreme anxiety and panic attacks and trouble

sleeping. Ms. Lech also told Defendant Von Goeler that she had experienced a

miscarriage six years ago due to a uterine rupture. Defendant Von Goeler also became

aware that Ms. Lech was suffering from headaches.

32. On December 18, 2013, WCC staff transported Ms. Lech to the Wesson Women's

Unit of Baystate Health in Springfield, MA for a prenatal checkup including an

ultrasound procedure.

33. On or about December 23, 2013, Ms. Lech began to experience decreased fetal

movement to the degree where she where she feared her pregnancy was in jeopardy.

34. On or about December 23, 2013, Ms. Lech began to experience a feeling of her baby

withering away inside of her making her tremendously afraid of the well being of her

baby.

35. On or about December 23, 2013, Ms. Lech also began experiencing extreme

cramping and bulging sensations in her abdomen, numbness in her leg, and an itching

sensation in the area of her vagina.

36. On or about December 23, 2013, Ms. Lech also began experiencing lightheadedness and painful headaches and blurry vision with regular frequency.

37. On or about December 23, 2013, Ms. Lech's anxiety symptoms became overwhelming triggering panic attacks and fitful and interrupted sleeping.

38. Also, on or about December 23, 2013, Ms. Lech began experiencing a greenish brown discharge from her vagina.

39. The above-mentioned sensations and symptoms were endured continuously and with increasing severity by Ms. Lech until January 2, 2014 and would be communicated to and ignored by WCC medical staff on multiple occasions.

40. On or about December 23, 2013, Ms. Lech noticed a brownish substance come from her vagina. Ms. Lech wrapped this substance in discarded packaging from a Ramen Noodles container. In an attempt to identify the substance, she presented it to WCC medical staff on several different dates. WCC medical staff eventually told Ms. Lech that the substance was her mucous plug.

41. Between December 23, 2013 and January 2, 2014, Ms. Lech sought medical attention for her pregnancy at the WCC on a daily basis, often with more frequency.

42. Often, Ms. Lech's requests to see medical personnel during this time period were denied outright by WCC staff.

43. On December 23, 2013, Ms. Lech reported to Defendant Diaz at the WCC that she felt her baby moving less since the previous day. When further inquiry was done, Ms. Lech repeated to Defendant Diaz that she felt that her baby was moving less than the day before, and that fetal movement had decreased to the degree that she was frightened for the life of her baby. Ms. Lech was told by medical staff to lie on her

side and count while drinking water. Ms. Lech begged to Defendant Diaz that she be taken to the hospital. At this time, Ms. Lech was not transported to the Baystate Medical Center or any other hospital. No contemporaneous notation of this December 23, 2013 interaction was made in WCC medical records by Defendant Diaz, but was made ten days later.

44. Also, on December 23, 2013, Ms. Lech went to Defendant Skorupski and Defendant Chase for help at the WCC. Ms. Lech again complained of significantly decreased fetal movement and an absence of a kicking sensation that was typically present and that fetal movement had decreased to the degree that she was frightened for the life of her baby. Ms. Lech complained of cramping and pain and a bulging sensation in her abdomen and reminded Defendant Skorupski and Defendant Chase that she presented a high-risk pregnancy. Ms. Lech begged to Defendant Skorupski and Defendant Chase that she be taken to the hospital. At this time, Ms. Lech was not transported to the Baystate Medical Center or any other hospital. Instead, Ms. Lech was told to lie down, count, and drink water.

45. On December 27, 2013, Ms. Lech again went to Defendant Rosado for help at the WCC. Ms. Lech again explained that she was bleeding, that her mucous plug came out, that she felt cramping, and that she felt less fetal movement to the degree that she was frightened for the life of her baby. Ms. Lech complained of a numb itching sensation in her leg and explained that she was experiencing extreme anxiety. Ms. Lech asked Defendant Rosado that she be taken to the hospital. At this time, Ms. Lech was not transported to the Baystate Medical Center or any other hospital.

46. On December 29, 2013, Ms. Lech went to Defendant Belle-Isle for help at the WCC. Ms. Lech repeated her symptoms including painful headaches, pain, cramping, and a bulging sensation in her stomach. Ms. Lech asked to go to the hospital. Ms. Lech was not transported to the hospital. Instead, Defendant Belle-Isle told Ms. Lech to rest with a cold compress and drink fluids.

47. On Monday, December 30, 2013, Ms. Lech again met with Defendant Von Goeler at the WCC. Ms. Lech explained to Defendant Von Goeler that she was experiencing cramps in her legs and stomach and that a greenish brown discharge was coming from her vagina and had been so for several days. Ms. Lech explained to Defendant Von Goeler that she was experiencing a racing heart, extreme anxiety and jumpiness, as well as headaches. Ms. Lech explained that she was seeing stars and spots as well having as blurry vision and tunnel vision. During the examination, Defendant Von Goeler became aware of the baby's quiet heartbeat and Ms. Lech's high blood pressure.

48. On Monday, December 30, 2013, Defendant Von Goeler told Ms. Lech that she was not concerned about Ms. Lech's symptoms and that the weak fetal heartbeat indicated by the examination was because Ms. Lech was "stressed out." Ms. Lech asked to be taken to the hospital. Defendant Von Goeler responded that no, she would not be brought to the hospital. Instead of immediately facilitating transfer to the hospital, Ms. Lech was told by Defendant Von Goeler to relax as stress was bad for her child.

49. Ms. Lech was told by Defendant Von Goeler to wait and explain her symptoms including that she was experiencing a green vaginal discharge to a nurse midwife.

50. Ms. Lech was not permitted to speak with a nurse midwife on December 30, 2013. An appointment with a nurse midwife was scheduled for January 2, 2014.

51. It is believed that during all relevant times, Defendant Von Goeler provided medical services at the WCC on a contractual basis through a community based and oriented health services program developed by the Hampden County Sheriff's Department.

52. Throughout the period of her incarceration, but most extremely in the period from December 23, 2013 to January 1, 2014, Ms. Lech's serious medical concerns went ignored, untreated, and undiagnosed. Ms. Lech's requests for a different diet, especially for fruit, were largely ignored. Ms. Lech's requests for medical attention were often completely ignored along with her pleas to be taken to the hospital.

53. Repeatedly, Ms. Lech's medical complaints regarding her baby were dismissed with a direction to lay down on her side, count fetal movement, and drink water. When Ms. Lech would sense decreased fetal movement while following these instructions, her discovery went ignored and she was told to do the same thing.

54. Multiple times during her incarceration and especially in the period from December 23, 2013 to January 1, 2014, Ms. Lech's complaints regarding her serious medical needs were expressly dismissed by medical staff who told her she was "overbearing." WCC medical staff would treat Ms. Lech as if she were nothing and often did not even appear to want her to speak. Often, Ms. Lech's attempts for help were met with comments that Ms. Lech would make a terrible mother before instructing her to go lie on her side, count fetal movement, and drink water.

55. On Wednesday, January 1, 2014, Ms. Lech was locked in her cell during a scheduled evening headcount. When Ms. Lech stood she felt wetness between her legs. This

13

wetness rapidly became a gushing sensation along with extreme cramping and overwhelming bulging sensation in her stomach. Ms. Lech went to the toilet inside her cell and saw that she was bleeding profusely and that her clothes were stained in blood and fluid. Ms. Lech then buzzed for assistance through an intercom in her cell telling WCC staff, including Cruz, that she was in labor and needed to go to the hospital immediately. WCC staff, including Cruz, responded that everything was fine, told Ms. Lech to wait, and that medical staff would be contacted after count was completed. Ms. Lech was not examined at this point or taken to the hospital.

56. After approximately twenty minutes, while Ms. Lech continued to bleed and suffer, a WCC correctional officer, Cruz, not medical personnel, inquired through intercom about Ms. Lech's status. Cruz asked "how bad" were her symptoms because nursing staff wanted to know if her complaints could "wait until morning." Ms. Lech continued to beg to be seen by medical staff because she was bleeding, in immense pain, and could not feel her baby moving. Ms. Lech's cellmate became outraged and began screaming for assistance. Ms. Lech waited in this state crying in terror and holding her stomach for fifteen minutes before she was permitted to leave her cell. No wheelchair was provided to Ms. Lech who was having difficulty walking.

57. WCC staff then took Ms. Lech to the medical department instead of to the hospital.

58. Once at the WCC medical department, Ms. Lech was forced to wait for what felt to her approximately an hour without any help. Ms. Lech was forced to wait despondent as she felt her future plans for herself and her son come crashing down around her and vanish. While Ms. Lech waited she continued to cry, experience acute pain and more and more intense cramping while she sat suffering without help.

59. At this time Ms. Lech was repeating "he's gone, he's gone" while her need for adequate medical attention was further delayed. When Ms. Lech told WCC that she believed her baby was dead and gone, WCC staff responded "he's fine."

60. Ms. Lech then met with Defendant Meaux. At this time, Ms. Lech again repeated to that she was experiencing pain, bleeding, cramping and discharge and felt no fetal movement and had been doing so for several days. Ms. Lech repeated that she had been experiencing these symptoms at her last visit with Defendant Von Goeler on Monday, December 30, 2013, and had been continuously experiencing them for a period of seven days.

61. During this interaction with Defendant Meaux on Wednesday, January 1, 2014, Ms. Lech showed signs of anguish as she alternated between smiling and crying. Despite her pleas, Ms. Lech was told that she would not be transported to the hospital at that time.

62. Defendant Meaux then told Ms Lech to explain her symptoms at a later prescheduled meeting with a midwife. Defendant Meaux further told Ms. Lech that Defendant Von Goeler had recently examined her and was not concerned about her symptoms. Ms. Lech continued to beg and plead to be taken to the hospital. Eventually, Defendant Meaux conducted tests, during which Defendant Meaux confused Ms. Lech's heartbeat with that of the baby. These tests revealed a dangerously low or nonexistent fetal heart rate. At that point, Defendant Meaux placed phone calls seeking apparent guidance instead of having Ms. Lech transported to the nearby hospital.

63. After consultation with Baystate Hospital staff, WCC staff were instructed to immediately bring Ms. Lech to the Baystate Hospital.

15

64. Instead of being immediately brought to the hospital, Ms. Lech was forced to wait near the nurse's station during a shift change for approximately one-half hour.

65. Before being transported to the hospital Ms. Lech was forced by WCC staff, including Vancini, to undergo security procedures including being forced to take off all of her clothes, being handcuffed, being electronically scanned, being searched, being told to shake out her hair and wiggle her toes, being told to bend over and spread apart her buttocks for inspection, and to cough three times all while Ms. Lech continued to bleed and while her blood was dripping on the floor.

66. After being searched, Ms. Lech was forced to wait again. While waiting, when Ms. Lech attempted to lie in a fetal position to relive her suffering, she was yelled at by Vancini and told to sit up.

67. Ms. Lech was then transported to the Baystate Medical Center by a WCC correctional officer rather than medical staff and in a cruiser rather than an ambulance.

68. From the time Ms. Lech spoke with WCC medical staff to her admittance at the hospital, approximately four and a half hours passed.

69. At an exam upon arrival at Baystate Medical Center, hospital staff detected abnormal vaginal bleeding and vaginal discharge.

70. Ms. Lech's cervix was four to five centimeters in dilation.

71. Hospital staff also noticed signs of a placental abruption, a serious pregnancy complication that puts the health of both mother and baby in serious jeopardy.

72. No fetal movement or heartbeat was detected. Ms. Lech told hospital staff that she had not felt her baby move for multiple days.

73. At this point, hospital staff concluded that an intrauterine fetal demise had occurred.

74. After an initial examination at the hospital, Ms. Lech immediately underwent an emergency Caesarian Section operation to reduce the risk of further damage to her. The Caesarian Section showed that the head of Ms. Lech's baby had begun to pass by her cervix.

75. On January 2, 2014, Ms. Lech's son Kaiden was still born.

76. Kaiden's gestational age was thirty-four and three-sevenths weeks. Among other symptoms, his body was extensively macerated, indicating he had died and was retained inside the uterus for a period of time after his death.

77. An autopsy examination revealed blood clotting and acute Chorioamnionitis, a type of infection, among other abnormalities. Chorioamnionitis is often diagnosed by a rapid heartbeat either in the mother or her child, or by the presence of discharge. Early treatment of this type of infection is essential and can be accomplished with a course of antibiotics.

78. As a result of the intentional, reckless, and negligent disregard for Ms. Lech's well being, including, but not limited to ignoring clear signs of infection, labor, miscarriage and other dangerous symptoms including decreased and ceased fetal movement in a patient with a known high risk pregnancy and by refusing to transport her to a nearby hospital and otherwise delaying adequate medical care despite reporting over a continuous week of cramping, discharge, bleeding, pain, and decreased and eventually ceased fetal movement among other symptoms to her jailers and medical staff, Ms. Lech has experienced and continues to experience extreme mental anguish, pain and suffering, loss of enjoyment of life, the death of her son, and occurred other related damages.

79. To this date, Ms. Lech experiences severe consequences of her injuries including depression and anxiety after feeling her baby wither away and die inside her while her requests for help went ignored or were met with outright ridicule. Until the present date, Ms. Lech still seeks professional help and takes medication for these injuries.

<u>COUNT I</u>

<u>Cruel and Unusual Punishment: Deliberate Indifference to Serious Medical Need</u>

*Against Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase, Cruz, Vancini, Ashe and Murphy*

80. Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

81. Ms. Lech's condition was a serious medical need. WCC were aware of Ms. Lech's serious medical need due to a high-risk pregnancy no later than October 2013.

82. No later than December 23, 2013, WCC medical staff were aware of Ms. Lech's complications and acute symptoms and that Ms. Lech required access to emergency medical care.

83. No later than December 23, 2013, Ms. Lech's need for emergency medical care was apparent even to a layperson with no formal medical training or experience.

84. By their acts and omissions, Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase, Cruz, Vancini, Ashe and Murphy intentionally injured Plaintiff without just cause.

85. At all time material to this complaint Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase, Cruz, Vancini, Ashe and Murphy acted under color of state law.

86. The actions and omissions of Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, and Chase including intentionally refusing to allow Plaintiff to

18

obtain appropriate medical care, failing to take reasonable measures to treat Ms. Lech's condition, and failing to determine and provide care for Ms. Lech that was informed by her specific serious medical needs as a woman undergoing a high risk pregnancy, and despite Ms. Lech's continued and repeated pleas for competent care, demonstrated deliberate indifference to the serious medical needs of Ms. Lech and constituted cruel or unusual punishment that unlawfully deprived Ms. Lech of the rights guaranteed to her by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

87. The actions and omissions of Defendants Cruz and Vancini including intentionally refusing to allow Plaintiff to promptly obtain appropriate medical care, failing to take reasonable measures to treat Ms. Lech's condition, intentionally delaying and interfering with medical care and failing to promptly and adequately assist an inmate during a serious medical emergency, demonstrated deliberate indifference to the serious medical needs of Ms. Lech and constituted cruel or unusual punishment that unlawfully deprived Ms. Lech of the rights guaranteed to her by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

88. The actions and omissions of Defendants Ashe, Murphy, and Chase including but not limited to failing to provide Ms. Lech with constitutional levels of medical care over the period of her pregnancy, failing to oversee medical contractors and employees, interference with medical care, refusing to establish and enforce protocols which would have seen Ms. Lech transported to outside care providers and to do so in a prompt and proper manner have directly resulted in the unconstitutional care provided to Ms. Lech.

89. The customs and policies of Defendants Ashe, Murphy, and Chase, including the custom and policy of refusing to provide Ms. Lech with constitutional levels of medical care over between December 23, 2013 and January 2, 2014, refusing to permit access to outside health care providers, and allowing employees and contractors to provide unconstitutional levels of care to a pregnant inmate with a high risk pregnancy, and allowing employees and contractors interfere with medical care and dictate medical care decisions despite orders from outside health care professionals have directly resulted in the unconstitutional care provided to Ms. Lech.

90. These Defendants' actions and omissions have caused harm to Ms. Lech mental and physical condition, have caused her extreme pain and suffering, and the loss of her son Kaiden.

<u>COUNT II</u>

<u>8th Amendment and 42 U.S.C. § 1983 - Supervisory Liability</u>

*Against Defendants Ashe, Murphy, and Chase*

91.  Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

92. The WCC opened in September 2007 and operates exclusively as a jail for women.

93. Upon information and belief, many pregnant inmates have been incarcerated at the WCC during the time of its operation.

94. Defendants Ashe, Murphy, and Chase developed and maintained policies and customs exhibiting deliberate indifference to Ms. Lech's constitutional rights and their conduct and inaction amounted to a reckless or callous indifference to the constitutional rights of Ms. Lech.

20

95. Defendants Ashe, Murphy, and Chase failed to train and supervise WCC staff on the rights of pregnant inmates, thereby demonstrating a deliberate indifference to Ms. Lech when it left her in the care and custody of untrained and improperly supervised WCC staff members while she was pregnant.

96. Upon information and belief, Defendant Ashe, as the Sheriff of Hampden County, was the highest-ranking Hampden County Sheriff's Department official, had direct management supervision over all Hampden County Sheriff's Department staff, and was responsible for setting and implementing Hampden County Sheriff's Department policy and customs with respect to all jail facilities.

97. Upon information and belief, Defendant Murphy, as the Assistant Superintendant of the WCC and chief jail administrator of the WCC, was the highest ranking official at the WCC, had direct management supervision over the WCC staff, and was responsible for setting and implementing WCC policy and customs with respect to WCC facilities. In the alternative, Defendant Murphy was inadequately hired, trained and supervised by Defendant Ashe and/or the Hampden County Sheriff's Department.

98. Upon information and belief, Defendant Chase was a Nursing Supervisor with direct management supervision over the WCC medical staff, and was responsible for setting and implementing WCC policy and customs with respect to WCC medical staff. In the alternative, Defendant Chase was inadequately hired, trained and supervised by Defendants Ashe and Murphy.

99. Defendant Chase personally knew about Ms. Lech's requests for adequate medical treatment.

100.    Upon information and belief, Defendant Chase directed WCC staff to refuse Ms. Lech's access to adequate medical care.

101.    Defendant Chase did not take any corrective action to address Ms. Lech's serious medical needs.

102.    At the time of the above-described series of events it was the custom or policy of Defendants Ashe, Murphy, and Chase to inadequately supervise and train its correctional officers and medical staff with respect to the care of pregnant inmates, thereby evidencing a deliberate indifference to Ms. Lech's constitutional rights.

103.    Defendants Ashe, Murphy, and Chase were deliberately indifferent to Ms. Lech's constitutional rights by failing to have a policy in place to protect the rights of pregnant inmates.

104.    Defendants Ashe and Murphy's customs and policies, including but not limited to shackling and chaining pregnant inmates, ignoring a pregnant inmate's serious medical condition and requests for medical attention, prioritizing unneeded security screens over prompt transport to an emergency care center, failing to prioritize prompt medical attention instead of headcounts and shift changes, and failing to ensure proper staffing levels to facilitate prompt transport of inmates in acute medical need, demonstrate both excessive force and deliberate indifference to the constitutional rights of pregnant women within the WCC and caused the violation of Plaintiff's rights alleged herein.

105.    Ms. Lech requested medical attention multiple times from several different WCC staff members from December 23, 2013, up and until she was transferred the Baystate Medical Center on January 2, 2014.

106.    On multiple occasions, Ms. Lech's requests for medical attention were denied

outright.

107.    Ms. Lech was told on multiple occasions by WCC staff that she would have to

wait to see an appropriate healthcare provider.

108.    The need for training of WCC staff on the rights of pregnant inmates is obvious,

and the lack of training and supervision by Defendants Ashe, Murphy, and Chase was

so inadequate that it was likely to result in violating the rights of pregnant inmates,

including Ms. Lech.

109.    Defendants Ashe, Murphy, and Chase's failure to supervise WCC staff

constituted a tacit authorization of the offensive acts and harm complained of herein.

110.    As a direct and proximate result of Defendants Ashe, Murphy, and Chase's

customs and policies, Ms. Lech sustained damages.

<u>COUNT III</u>

<u>Violation of Article 26 of the Massachusetts Declaration of Rights: Deliberate
Indifference to Serious Medical Need</u>

*Against Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase,
Cruz, Vancini, Ashe and Murphy*

111.    Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

112.    The actions and omissions of Defendants Von Goeler, Skorupski, Meaux, Diaz,

Rosado, Belle-Isle, and Chase including intentionally refusing to allow Plaintiff to

obtain appropriate medical care, failing to take reasonable measures to treat Ms.

Lech's condition, and failing to determine and provide care for Ms. Lech that was

informed by her specific serious medical needs as a woman undergoing a high risk

pregnancy, and despite Ms. Lech's continued and repeated pleas for competent care,

demonstrated deliberate indifference to the serious medical needs of Ms. Lech and constituted cruel or unusual punishment that unlawfully deprived Ms. Lech of the rights guaranteed to her by Article 26 of the Massachusetts Declaration of Rights, and as enforceable through G.L. c.12 § 11I.

113.    The actions and omissions of Defendants Cruz and Vancini including intentionally refusing to allow Plaintiff to promptly obtain appropriate medical care, failing to take reasonable measures to treat Ms. Lech's condition, intentionally delaying and interfering with medical care and failing to promptly and adequately assist an inmate during a serious medical emergency, demonstrated deliberate indifference to the serious medical needs of Ms. Lech and constituted cruel or unusual punishment that unlawfully deprived Ms. Lech of the rights guaranteed to her by Article 26 of the Massachusetts Declaration of Rights, and as enforceable through G.L. c.12 § 11I.

114.    The actions and omissions of Defendants Ashe, Murphy, and Chase including failing to provide Ms. Lech with constitutional levels of medical care over the period of her pregnancy, failing to oversee medical contractors and employees, interference with medical care, refusing to establish and enforce protocols which would have seen Ms. Lech transported to outside care providers and to do so in a prompt and proper manner have directly resulted in the unconstitutional care provided to Ms. Lech.

115.    The customs and policies of Defendants Ashe and Murphy, including the custom and policy of refusing to provide Ms. Lech with constitutional levels of medical care over the period of her pregnancy, refusing to establish protocols which would have seen Ms. Lech transported to outside care providers and to do so in a prompt and

proper manner, and failing to properly hire supervise and train medical staff and medical contractors have directly resulted in the unconstitutional care provided to Ms. Lech.

116.    These Defendants' actions and omissions have caused harm to Ms. Lech mental and physical condition, have caused her extreme pain and suffering and the loss of her son Kaiden.

## COUNT IV

### Medical Malpractice

*Against Defendants Von Goeler and Baystate Medical Practices, Inc.*

117.    Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

118.    Defendant Von Goeler is not public employee as defined by G.L. c. 258.

119.     Defendant Baystate Medical Practices, Inc., is not a public employer as defined by G.L. c. 258.

120.    Upon information and belief, during the term of Ms. Lech's incarceration and pregnancy Defendants Von Goeler and Baystate Medical Practices, Inc., were contractually obligated to provide and, had assumed responsibility for providing, adequate medical care to Mr. Lech.

121.    A doctor-patient relationship existed between Ms. Lech and Defendant Von Goeler.

122.    Defendant Von Goeler owed a duty to provide adequate medical care to Ms. Lech.

123.    Defendant Von Goeler breached her duty to provide adequate medical care to Ms. Lech and failed to conform to good medical practice.

25

124.    As a direct and proximate cause of this breach of duty, Defendant Von Goeler negligently damaged Ms. Lech with respect to diagnosis, treatment, monitoring and medications among other fashions.

125.    At all times pertinent hereto, Defendant Baystate Medical Practices, Inc., employed physicians and allied health staff, including upon information and belief Defendant Von Goeler, who should have recognized Ms. Lech's serious medical condition. Failure to recognize and treat this condition was negligence of Defendant Baystate Medical Center, Inc.

126.    Defendant Baystate Medical Practices, Inc. owed a duty to provide adequate medical care to Ms. Lech through its agents and employees including Defendant Von Goeler.

127.    Defendant Baystate Medical Practices, Inc., through its agent and employee Defendant Von Goeler, breached its duty to provide adequate medical care to Ms. Lech and failed to conform to good medical practice.

128.    As a direct and proximate cause of this breach of duty, Baystate Medical Practices, Inc., negligently damaged Ms. Lech.

129.    As a direct and proximate result of the negligence of Defendants Von Goeler and Baystate Medical Practices, Inc., Ms. Lech has suffered serious physical injuries and continuous to suffer from serious psychological injuries.

130.    Ms. Lech is exempted from the presentment of the claims alleged in Count IV as required by G.L. c. 231, § 60L as this Complaint is filed less than six months from the tolling of the statute of limitations.

26

<u>COUNT V</u>

<u>Negligence Under Massachusetts Torts Claims Act</u>

*Against Public Employer Hampden County Sheriff's Department*

131.    Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

132.    The Hampden County Sheriff's Department is a public employer as defined by

G.L. c. 258, §1 and *Garcia v. Essex County Sheriff's Department*, 65 Mass.App.Ct.

104 (2005).

133.    As a public employer, the Hampden County Sheriff's Department is liable for

harm caused by the negligent or wrongful acts or omissions of its public employees;

134.    At all times pertinent hereto, Defendants Skorupski, Meaux, Diaz, Rosado, Belle-

Isle, Chase, Cruz, Vancini, Ashe and Murphy were employees of the Hampden

County Sheriff's Department and were acting within the scope of their office or

employment.

135.    Defendants Skorupski, Meaux, Diaz, Rosado, Belle-Isle, and Chase owed a duty

to provide adequate medical care to Ms. Lech.

136.    Defendants Skorupski, Meaux, Diaz, Rosado, Belle-Isle, and Chase, breached

their duty to provide adequate medical care to Ms. Lech and failed to conform to

good medical practice.

137.    As a direct and proximate result of the negligence of Defendants Skorupski,

Meaux, Diaz, Rosado, Belle-Isle, and Chase, Ms. Lech has suffered serious physical

injuries, and continues to suffer from serious psychological injuries.

138.    Defendants Cruz, Vancini, Ashe and Murphy owed a duty of due care to Ms.

Lech.

27

139.    Defendants Cruz and Vancini breached their duty of due care owed to Ms. Lech by negligently failing to facilitate prompt access to appropriate medical care, negligently delaying and interfering with medical care and access to medical care, and otherwise failing to take reasonable measures to treat, assist, and respond to Ms. Lech's condition who was an inmate in their care and custody experiencing a serious medical emergency.

140.    As a direct and proximate result of the negligence of Defendants Cruz and Vancini, Ms. Lech has suffered serious physical injuries, and continues to suffer from serious psychological injuries.

141.    Defendants Ashe, Murphy, and Chase breached their duty of due care owed to Ms. Lech by negligently failing to facilitate prompt access to appropriate medical care, negligently delaying and interfering with medical care and access to medical care, and otherwise failing to take reasonable measures to treat, assist, and respond to Ms. Lech's condition who was an inmate experiencing a serious medical emergency.

142.    As a direct and proximate result of the negligence of Defendants Ashe, Murphy, and Chase, Ms. Lech has suffered serious physical injuries, and continues to suffer from, serious psychological injuries.

143.    Ms. Lech made proper presentment of these claims as required by G.L. c. 258, § 4.

144.    Ms. Lech is exempted from the presentment of any claims sounding in medical malpractice alleged in Count V as required by G.L. c. 231, § 60L as this Complaint is filed less than six months from the tolling of the statute of limitations.

COUNT VI
Intentional Infliction Of Emotional Distress

*Against Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase,*
*Cruz, Vancini, Ashe, and Murphy*

145.    Ms. Lech repeats and realleges the allegations set forth in all previous paragraphs.

146.    Defendants Von Goeler, Skorupski, Meaux, Diaz, Rosado, Belle-Isle, Chase,

Cruz, Vancini, Ashe and Murphy knew or should have known that their actions and

omissions as described throughout the Complaint would cause severe emotional

distress to Ms. Lech.

147.    These Defendants' actions were extreme, outrageous and beyond the bounds of

civilized decency.

148.    These Defendants' actions directly and proximately caused Ms. Lech to suffer

severe emotional distress.

149.    All defendants are sued in their individual capacities relevant to Count VI.

REQUEST FOR RELIEF

FOR THE ABOVE REASONS, Ms. Lech respectfully requests that this Court:

150.    Grant judgment in Ms. Lech's favor on all counts of the Complaint;

151.    Declare that Defendants have violated Ms. Lech's rights under the constitutional

provisions, federal and state laws described in the enumerated Counts above;

152.    Issue an injunction requiring Defendants Hampshire County Sheriff's Department,

Cocchi, Murphy, and Baystate Medical Practices, Inc. to develop and implement

adequate training programs for its correctional officers and medical staff about

individual rights under the Eighth Amendment.

29

153.    Award Ms. Lech compensatory and punitive damages, plus reasonable attorneys'

fees and costs incurred in bringing this action, and interest as allowed by law; and

154.    Grant Ms. Lech such other and further relief as the Court deems just and

equitable.

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL CLAIMS SO TRIABLE</u>

Respectfully submitted,
Lidia Lech
By her attorneys,

*/s/   David Rountree*
David Rountree, Esq.
BBO # 555763
277 Main Street, Suite 201
Greenfield, MA 01301
(413) 774-6900
rountreelaw@verizon.net

*/s/ John Godleski*
John Godleski, Esq.
BBO # 688999
 277 Main Street, Suite 300
Greenfield, MA 01301
(413) 695-8790
jack.godleski@gmail.com

<u>Certificate of Service</u>

Pursuant to Local Rules 5.2(b)(2) and 5.4(C), I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail on January 4, 2019.

I further certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants, of which there are believed to be none, on January 4, 2019.

*/s/ John Godleski*
John Godleski